# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **DAVID FINDLING**, in his capacity as Court Appointed Receiver, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) ) | Filed: |
| **REALCOMP II LTD., dba REALCOMP, INC. GREATER METROPOLITAN ASSOCIATION REALTORS, dba WESTERN WAYNE OAKLAND COUNTY ASSOCIATION OF REALTORS, DEARBORN AREA BOARD OF REALTORS, DETROIT ASSOCIATION OF REALTORS, EASTERN THUMB ASSOCIATION OF REALTORS, GROSSE POINTE BOARD OF REALTORS, LAPEER AND UPPER THUMB ASSOCIATION OF REALTORS, LIVINGSTON COUNTY ASSOCIATION OF REALTORS, AND NORTH OAKLAND COUNTY BOARD OF REALTORS,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF 15 U.S.C. §§ 1 and 2 SHERMAN ANTITRUST ACT |
| Defendants. | ) ) ) | |

## VERIFIED COMPLAINT

David Findling, by his attorneys, The Findling Law Firm, PLC, brings this civil antitrust

action against Defendants, Realcomp II Ltd. ("Realcomp"), Greater Metropolitan Association

Realtors ("GMAR"), Dearborn Board of Realtors dba Dearborn Area Board of Realtors

("Dearborn"), Detroit Association of Realtors ("Detroit"), Eastern Thumb Association of

Realtors("Eastern"), Grosse Pointe Board of Realtors ("Grosse Pointe"), Lapeer and Upper

Thumb Association of Realtors ("Lapeer"), Livingston County Association of Realtors

("Livingston"), and North Oakland County Board of Realtors ("North Oakland") (collectively the

"Defendants") to obtain equitable and other relief for violation of the Sherman Act, 15 U.S.C. § 1

et seq., as amended.

## __INTRODUCTION__

Plaintiff, David Findling ("Findling")[1] is an attorney and, inter alia, serves as a Receiver,

Assignee for the Benefit of Creditors and Bankruptcy Trustee. Pursuant to MCL 339.2503(1) and

(2), Findling is exempt from the licensure requirements for the sale of real property in Michigan

while acting in the enumerated roles identified by the statute (the "Exempt Roles").[2]  Findling

brings this action on behalf of the estates he represents and other sellers, in their Exempt Roles,

---

[1]When identified, references to Findling, as the seller of real estate, are limited to circumstances where he is acting on behalf of an estate in one of the Exempt Roles and not acting individually.

[2]MCL 339.2503(2) explains that: This article [the Occupational Code] shall not include the services rendered by an attorney at law as an attorney at law, nor shall it include a receiver, trustee in bankruptcy, administrator, executor, a person selling real estate under order of a court, nor a trustee selling under a deed of trust. This exemption of a trustee shall not apply to repeated or successive sales of real estate by the trustee, unless the sale is made through a licensed real estate broker.

who are unable to list real estate for sale but instead must employ member brokers and agents of Realcomp and the Realcomp Owners.

Defendant, Realcomp, through its Board of Governors, shareholder realtor boards including Defendants, GMAR, Dearborn, Detroit, Eastern, Grosse Pointe, Lapeer, Livingston, and North Oakland (collectively the "Realcomp Owners"), and Realcomp's individual members, have unlawfully restrained competition for the listing and sale of real estate in Southeastern Michigan, (the "Detroit Market").  Realcomp and the Realcomp Owners have unlawfully restrained competition by enacting and enforcing unlawful rules, policies, and procedures that has caused Findling and others in their Exempt Roles to pay higher prices for real estate brokerage services (i.e., real estate brokerage commissions and any other fees charged) than they would have paid absent Defendants' illegal conduct.  Findling seeks to obtain relief for Defendants' violation of the Sherman Act and to enjoin Defendants from enforcing certain of their rules that unreasonably restrain competition.

Realcomp is a multiple listing service, which is controlled by its constituent Realcomp Owners which are broker/realtor associations.  Realcomp has approximately 14,000 members (almost half of all Michigan realtors), and no other Michigan MLS has a comparable geographic reach or membership size.

Realcomp's primary member benefit is its MLS, the largest in Michigan. An MLS is an information sharing service that provides data about homes listed for sale by its members within a geographic area.  MLS listings contain details about a property's features, an offer of compensation, and the level of services offered in the listing agreement. By centralizing this information, the MLS makes the marketplace for homes more efficient and orderly. As a

consequence, it is the most effective marketing tool for residential real estate in Southeastern Michigan. Realcomp's MLS is a closed-network database, available only to the members of the Realcomp Owners.

Most prospective home buyers engage the services of a broker to purchase a home. Real estate brokers formed Realcomp to facilitate the sale of property between buyers and sellers. Realcomp pools and disseminates information on almost every property available for sale in the Detroit Market. It combines its members' property listings information into an electronic database and makes this data available to all brokers who are members of the MLS. By listing information on a home in the MLS, it can be marketed to a large number of potential buyers. A broker representing a buyer likewise can search the MLS to provide a home buyer with information about nearly all the listed properties in the area that match the buyer's housing needs.

Members of Realcomp utilize the MLS database as a clearinghouse to, among other things: communicate the listings information of the properties that they have for sale to other members; offer to compensate other members as cooperating brokers if they locate purchasers for those listings; locate properties for prospective purchasers; distribute listings to other members for advertisement purposes; and compile and distribute market statistics. Realcomp also maintains records of sold homes. These "sold data" records are very important for brokers working with sellers to set an optimum sales price. Brokers representing a buyer likewise use the sold data to help buyers determine what price to offer for a home. Access to the MLS database provided by Realcomp is critical for those who wish to serve or act as buyers or sellers successfully in the Detroit Market. By virtue of market-wide participation and control over a critically important input, Realcomp has market power.

-4-

Access to Realcomp, through the Realcomp Owners, is restricted to licensed real estate brokers, realtors and appraisers. Though Findling is exempt from licensure, GMAR has refused to admit Findling because he is not a licensed realtor, broker or appraiser. In addition, because GMAR has refused Findling membership, he cannot obtain access to Realcomp and its MLS. The other Realcomp Owners have restrictions on membership which similarly restrict Findling and others in the Exempt Roles from obtaining access to Realcomp's MLS.

Findling seeks an award of monetary damages, trebled pursuant to statute, and the issuance of an injunction which enjoins the Defendants from continuing their antitrust violations.

### THE PARTIES

1. Plaintiff, Findling is a licensed attorney in Michigan and Massachusetts whose principal practice is devoted to serving as a Court Appointed Receiver, Assignee for the Benefit of Creditors and Bankruptcy Trustee.

2. Findling lives and works in Oakland County, Michigan and his principal place of business is 415 S. West St., Royal Oak, Michigan 48067.

3. Findling was appointed Receiver, and as described herein, has listed and sold real property, and as a result of Defendants' violations of the Sherman Act unnecessarily has had to pay or will pay a commission for real estate brokerage services offered by Defendants.

### VENUE

4. Defendant, Realcomp is a for profit Michigan corporation which manages a multiple listing service owned and operated by the Realcomp Owners which are eight (8) Boards/Associations of realtors, including:

    a. GMAR whose principal place of business is 20 Oak Hollow, Suite 100, Southfield,

Michigan 48033.  Realcomp's resident agent is Karen Kage;

b.   Dearborn whose principal place of business is 2350 Monroe St., Dearborn, Michigan 48124. Dearborn's resident agent is Laura M. Green;

c.   Detroit whose principal place of business is 2111 Woodward Ave., Detroit, Michigan 48201. Detroit's resident agent is Fred Pickens;

d.   Eastern whose principal place of business is 512A McMorran Blvd., Port Huron, Michigan 48060. Eastern's resident agent is Bill Butler;

e.   Grosse Pointe whose principal place of business is 710 Notre Dame, Suite 2, Grosse Pointe, Michigan 48230. Grosse Pointe's resident agent is Robert E. Taylor, Jr.;

f.   Lapeer whose principal place of business is 110 N. Saginaw Street, Suite 2, Lapeer, Michigan 48446. Lapper's resident agent is Colleen Lewis;

g.   Livingston whose principal place of business is 8025 Grand River Road, Brighton, Michigan 48114. Livingston's resident agent is Pamela Leach; and

h.   North Oakland whose principal place of business is 4400 W. Walton Blvd., Waterford, Michigan 48329. North Oakland's resident agent is Patricia A. Jacobs.

5.   The Realcomp Owners transact business and maintain their principal places of business within this District.

6.   Realcomp transacts business and maintains its principal place of business in Farmington Hills, Oakland County, Michigan and is found within this District.

7.   Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).

**JURISDICTION**

8.   This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, as amended, 15 U.S.C. §§ 1-7, and 28 U.S.C. §§ 1331, 1337(a), and 1345 and under 8 U.S.C. §1367(a) has supplemental jurisdiction over the state law claims under the Michigan Antitrust Reform Act, MCL 445.771 et seq.

9.  Realcomp and the Realcomp Owners have caused Findling and those in the Exempt Roles to sustain injuries to their business and their property as a result of their forbidden acts in violation of the antitrust laws.  Pursuant to 15 U.S.C. § 15, Findling and those in the Exempt Roles have standing to sue in this District.

## REQUIREMENTS FOR PARTICIPATION IN REALCOMP's MLS

10.  On its website, Realcomp describes itself as a:

> "REALTOR®-owned Multiple Listing Service that delivers first-rate data services, support, & instruction to the real estate industry. Realcomp II Ltd. is Michigan's largest Multiple Listing Service, now serving more than 13,100 valued broker, agent, and appraiser customers in over 2,200 offices across Southeast Michigan."

11.  Realcomp's primary member service is its MLS, which is a closed database system accessible only to member brokers and, in a more limited form, to the general public through data feeds to various public websites.  MLS listings include information about real property for sale, the type of listing agreement, a description of the services provided by the listing broker, and an offer to compensation to any broker who procures a buyer for the property.  The MLS enhances information sharing among members and provides enforceable rules governing the sale of listed properties.

12.  Realcomp provides a variety of services to the Realcomp Owners, including the maintenance of a database of past and current listings of properties for sale in The Detroit Market.

13.  Realcomp's customers subscribe to Realcomp's residential brokerage services, including access to a multiple-listing service ("MLS"), "a database of information about properties for sale ... that can be viewed and searched by all other local brokers who practice in

the area and participate in the MLS." *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 820 (6th Cir.2011) (internal quotations and citations omitted).

14.  Access to Realcomp's database is critical to successfully evaluate, market and sell real property in the Detroit Market.

15.  Therefore, for Findling to evaluate, list and sell real property in the Detroit Market while serving in one of the Exempt Roles, he needs to be a member of Realcomp.

16.  By their rules, the Realcomp Owners, including GMAR deny membership to anyone serving in one of the Exempt Roles unless they are a licensed realtor, licensed broker or a licensed appraiser.

17.  While serving in one of the Exempt Roles, Findling and others are required to engage and compensate a listing broker or realtor to list properties for sale.

18.  The compensation paid to a listing broker or realtor is a financial burden on an insolvency estate and causes unnecessary costs to be incurred.

19.  By adopting and enforcing rules that restrict access to Realcomp's database and limit membership, Realcomp and the Realcomp Owners have restrained competition, caused an increase in costs for the insolvency estates managed by those in the Exempt Roles, including Findling.

20.  On Friday, July 15, 2016, Findling submitted his application for membership to GMAR (the"Application")(See Application, Exhibit A).

21.  On Monday, July 18, 2016, Findling received an e-mail from GMAR Membership Director, Elaine Gatlin indicating the Application "will be processed today".

22.  Pursuant to the 2014 Bylaws of GMAR, upon the submission of the Application,

Findling: [Applicants]...shall be granted provisional membership immediately upon submission of a completed application form and remittance of applicable Association dues and any application fee. Further, Provisional members...shall be subject to all of the same privileges and obligations of membership.  (GMAR 2014 Bylaws, § 3(a))

23.  Following the July 18th e-mail, Findling received a telephone call from Ms. Gatlin wherein she informed him that his application had been denied because he was not a real estate agent, broker or appraiser.

24.  Subsequent efforts by Findling through the National Association of Realtors and its legal counsel, Greg McClelland to permit acceptance of his GMAR application and access to Realcomp were unsuccessful.

25.  Findling resubmitted his application for admission to GMAR on November 9, 2016.

26.  On December 22, 2016, Porsha Hall, Membership Director of GMAR, sent an e-mail which informed Findling that his renewed application had been denied:

> To David Findling,
>
> Thank you for your recent membership application to the Greater Metropolitan Association of REALTORS.
>
> The REALTOR® Membership Application dated July 15, 2016 which was resubmitted to the Association on December 16, 2016, has been considered by the Board of Directors pursuant to Article V, Section 3 of the Association Bylaws and Board of Directors has determined that the individual does not meet the following qualifications for membership as established in the Association's Bylaws:
>
> 1)  The individual does not maintain nor is associated with an established real estate office in the State of Michigan, as required by Article IV, Section 1(a); and
>
> 2)  The individual does not maintain a current, valid real estate broker's or salesperson's license as required by Article V, Section 2(a).

> For these reasons, the Board of Directors have denied your REALTOR®
> Membership Application.
>
> Best regards,
> Porsha Hall | Membership Director
> Greater Metropolitan Association of REALTORS®

27.  As of the filing of this Complaint, GMAR has refused to admit Findling as a member and he is unable to obtain access to Realcomp.

28.  Upon information and belief, as of the filing of this Complaint, the Realcomp Owners maintain substantially similar rules and policies which exclude Findling and others in the Exempt Roles from membership.

29.  The Realcomp Owners' rules and policies requiring licensure as a broker or salesperson and which deny admission to those in Exempt Roles lack a cognizable procompetitive justification and there is no evidence of any actual procompetitive benefits.

30.  Realcomp's denial of access to non-members combined with the Realcomp Owners' rules and policies barring those in Exempt Roles reflect a deliberate effort to protect established commissions and prevent the reduction in the cost of selling a home.  See also *Realcomp II Ltd. v. FTC*, 635 F.3d 815, 836 (6th Cir. 2011).

## REALCOMP'S MONOPOLY POWER IN THE DETROIT MARKET

31.  In 2011, the Sixth Circuit Court of Appeals engaged in a lengthy description and discussion of Realcomp's services, its operation, membership and its role in the Detroit real estate market which is incorporated into this Complaint by reference.  *Realcomp II, Id* at 819-822.

32.  Further, in *Realcomp II*, the Court concluded that there was substantial evidence to

support the FTC's findings that Realcomp possessed substantial market power. *Realcomp II, Id* at 828.

33. Realcomp continues to be organized and operate in a substantially similar manner as it did when the FTC made its findings in 2007 and when the Sixth Circuit issued its *Realcomp II* holding in 2011.

## GROUP BOYCOTT AND TYING

34. Realcomp and the Realcomp Owners have contracted and conspired to fix the real estate commissions of their members by excluding Findling and those in the Exempt Roles.

35. Realcomp and the Realcomp Owners have engaged in a group boycott by adopting substantially similar rules, policies and bylaws which require licensure as a real estate agent, broker or appraiser as a condition of membership.

## MODEL ASSOCIATION BYLAWS

36. The National Association of Realtors ("NAR") publishes model bylaws for local member boards (the "Model Bylaws")(See Model Bylaws, Exhibit B).

37. The Model Bylaws incorporate provisions which deny membership to Findling and those in the Exempt Roles under the Section V titled Qualification and Election (the "Qualification Restrictions").

38. Upon information and belief, the Realcomp Owners' bylaws substantively adopt the same Qualification Restrictions as set forth in the Model Bylaws.

## MODEL MLS RULES AND REGULATIONS

39. Realcomp publishes model rules and regulations for local MLS' (the "Model Rules")(See Model Rules, Exhibit C).

40.  The Model Rules incorporate provisions which deny membership to Findling and those in the Exempt Roles under the Section V titled Qualification and Election (the "Qualification Restrictions").

41.  The NAR publishes model Rules and Regulations for adoption by its members realtor associations.

42.  The Realcomp Owners collectively include the Qualification Restrictions in their Bylaws and the Realcomp Owners adopt the same amendment date as that set forth in the Model Bylaws.

## MODEL MLS BYLAWS

43.  Realcomp and the Realcomp Owners have engaged in a group boycott by excluding Findling and those in the Exempt Roles from membership.

44.  Realcomp and the Realcomp Owners have engaged in a group boycott and an illegal tying arrangement which exclude Findling and those in the Exempt Roles from access to the Detroit Market.

## THE EXCLUSION OF FINDLING AND THOSE IN THE EXEMPT ROLES BY THE REALCOMP OWNERS' AND REALCOMP'S RULES, REGULATIONS AND BYLAWS IS *PER SE* UNREASONABLE

45.  Under per se analysis, "certain agreements or practices are so ' plainly anticompetitive,' ... and so often 'lack ... any redeeming virtue,' ... that they are conclusively presumed illegal without further examination." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

46.  The exclusion of Findling and those in the Exempt Roles from membership in the Realcomp Owners and Realcomp is so ' plainly anticompetitive,' ... and 'lack[s] ... any redeeming

virtue,' ... [that it should be] ... conclusively presumed illegal without further examination."

### A TIE EXISTS BETWEEN MEMBERSHIP IN THE REALCOMP OWNERS' AND REALCOMP

47.   A tie exists between two separate products; membership and access to the Realcomp multi-listing service which cannot be obtained without purchasing the tied product: i.e., a membership with the Realcomp Owners.

48.   Realcomp has sufficient market power to restrain free competition for the sale and the cost of sale of real estate for the tied product market, i.e. the Detroit Market.

49.   Realcomp and its MLS hold a monopolistic position in the Detroit Market.

50.   Realcomp is owned by the Realcomp Owners and they and their members, collectively have an economic interest in excluding unlicensed sellers of real estate from the Realcomp MLS.

51.   The tie between membership in Realcomp and with the Realcomp Owners affects a substantial amount of interstate commerce for the sale of real estate in the Detroit Market.

52.   Due to Realcomp and its MLS's market power and monopolistic position, there is no viable alternative to Findling and those in the Exempt Roles to effectively list and sell real estate in the Detroit Market.

53.   The rules of Realcomp are the product of agreements and concerted action among the Realcomp Owners and their members who compete in the Detroit Market.

54.   The Realcomp Owners, as a group and through the Board they elect and the staff they indirectly employ, maintain and enforce MLS rules affecting participation in the MLS.

55.   Realcomp unlawfully ties its membership and access to its MLS services (the "Tying Product") with membership in the Realcomp Owners (the "Tied Product").

56.  By conditioning membership and access to Realcomp's MLS service on membership with the Realcomp Owners an unlawful group boycott has occurred.

57.  Conditioning access to the Tying Product with the Tied Product has caused the exclusion of Findling and those in the Exempt Roles from the being able to effectively list and sell real estate in the Detroit Market.

58.  Findling and those in the Exempt Roles have been denied membership with the Realcomp Owners and cutoff from access to Realcomp which they require to access the Detroit Market.

59.  The Realcomp Owners and Realcomp possess a dominant position in the Detroit Market.

60.  The Realcomp Owners and Realcomp are unable to offer plausible arguments that cutting off those in the Exempt Roles from access to the Realcomp MLS enhance's overall efficiency, offers public protections or makes the Detroit Market more competitive.

61.  The State of Michigan, through its enacted legislation has chosen to exempt Findling and those in the Exempt Roles from licensure as a realtor, real estate broker or real estate appraiser.  See MCL 339.2503.

62.  There is no plausible economic or public benefit to conditioning membership on licensure when the State of Michigan has determined that licensure is not necessary to list and sell real estate while Findling and others serve in the Exempt Roles.

63.  The anticompetitive effect of the Realcomp Owners and Realcomp's restrictions and limitations to access to the MLS and the Detroit Market are clear.

64.  The listing of and selling real estate by Findling and those in the Exempt Roles is

-14-

specifically authorized by law under MCL 339.2503.

65.  While exempted from the real estate licensure requirements of the Occupational Code, Findling and those in the Exempt Roles remain subject to professional licensure and/or court supervision as bankruptcy trustees, administrators, executors (personal representatives) and receivers. See *Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 465 (1999).

66.  Findling and those in the Exempt Roles have been forced to pay real estate commissions in exchange for the listing of real property by a licensed real estate agent who is also a member of a Realcomp Owner and a member of Realcomp.

67.  Realcomp and the Realcomp Owners have used their group boycott and tying arrangement to maintain and augment their pre-existing market power and impair competition on the merits in the Detroit Market.

68.  Realcomp and the Realcomp Owners have contracted and conspired to violate the antitrust laws, monopolize the Detroit Market, discriminate against Findling and those in the Exempt Roles with an anti-competitive effect and to engage in unfair trade practices.

**DENIAL OF FINDLING AND THOSE IN THE EXEMPT ROLES' MEMBERSHIP IN GMAR AND THE OTHER REALCOMP OWNERS AND REALCOMP IS UNREASONABLE PER SE**

69.  Whenever this complaint refers to any act, deed, or transaction of Realcomp, it means Realcomp is engaged in the act, deed, or transaction by or through its owners, members, officers, directors, trustees, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

70.  Various others, not named as Defendants, including the National Association of Realtors, have participated as conspirators with Realcomp in the violations alleged in this

complaint, and have performed acts and made statements to further the conspiracy.

## ANTICOMPETITIVE EFFECTS
## AND ANTITRUST INJURIES SUSTAINED BY FINDLING

71.  Findling and those in the Exempt Roles are compelled to employ brokers and realtors who are members of the Realcomp Owners who are in turn members of Realcomp and who collectively control access to the Realcomp MLS by controlling membership.

72.  Findling objects to the fees he and others in the Exempt Roles are forced to pay for unwanted services to list real property for sale on the Realcomp MLS.

73.  Findling and those in the Exempt Roles, and the estates they represent, have an economic interest in access to Realcomp's MLS.

### A.  The Perkins Receivership

74.  Findling was appointed in the Perkins Receivership for the purpose of selling certain real property located at 24551 Pine Village, Oak Park, Michigan (the "Perkins Property").

75.  Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain Leonard Goudy as listing realtor to list the Perkins Property for sale on the Realcomp MLS.

76.  The Receivership Estate in the Perkins Receivership was forced to pay $4,000 in listing fees due to Defendants' rules and policies and GMAR's refusal to accept Findling's application.

### B.  The Carr Receivership

77.  Findling was appointed in the Carr Receivership for the purpose of selling certain real property located at 27111 Scenic Hwy., Franklin, Michigan (the "Carr Property").

78.  Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to

retain Mathias McGuire as listing realtor to list the Carr Property for sale on the Realcomp MLS.

79. The Receivership Estate in the Carr Receivership paid $34,500 in listing fees.

### C. The Flowers Receivership

80. Findling was appointed in the Flowers Receivership for the purpose of selling certain real property located at 4123 Castlewood Drive, Wixom, Michigan 48393 (the "Flowers Property").

81. Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain Scott A. Wright of Keller Williams as listing realtor to list the Flowers Property for sale on the Realcomp MLS.

82. The Receivership Estate in the Flowers Receivership paid $17,400.00 in listing commission fees.

### D. The Schwartz Receivership

83. Findling was appointed in the Schwartz Receivership for the purpose of selling certain real property located at 21 Fairwood Blvd., Pleasant Ridge, Michigan 48069 (the "Schwartz Property").

84. Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain Scott A. Wright of Keller Williams as listing realtor to list the Schwartz Property for sale on the Realcomp MLS.

85. The Receivership Estate in the Flowers Receivership paid $15,060.00 in listing commission fees.

### E. The Johnson Receivership

86. Findling was appointed in the Johnson Receivership for the purpose of selling certain

real property located at 917 Balfour, Grosse Pointe Park, Michigan 48230 (the "Johnson Property").

87.  Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain Dan Clem of Clients First Realtors as listing realtor to list the Johnson Property for sale on the Realcomp MLS.

88.  The Receivership Estate in the Johnson Receivership paid $14,925.00 in listing commission fees.

### E.  The Simmons Receivership

89.  Findling was appointed in the Simmons Receivership for the purpose of selling certain real property located at 14353 Village Court, Plymouth, Michigan 48170 (the "Simmons Property").

90.  Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain John Vergona Clients First Realtors as listing realtor to list the Simmons Property for sale on the Realcomp MLS.

91.  The Receivership Estate in the Simmons Receivership paid $13,860.00 in listing commission fees.

### F.  The Covert Receivership

92.  Findling was appointed in the Covert Receivership for the purpose of selling certain real property located at 28482 Cleveland, Livonia, Michigan 48150 (the "Covert Property").

93.  Due to Realcomp and the Realcomp Owners' rules and policies Findling was forced to retain Joy Montgomery of Montgomery Hill Real Estate as listing realtor to list the Covert

Property for sale on the Realcomp MLS.

94.  The Receivership Estate in the Covert Receivership paid $5,500.00 in listing commission fees.

## INTERSTATE COMMERCE

95.  Realcomp's activities and the violations alleged in this Complaint affects Findling, those in the Exempt Roles, and brokers, agents, home buyers, home sellers located throughout the United States.  Realcomp's real estate activities are in the flow of, and have a substantial effect on, interstate commerce.

96.  The Realcomp Owners provide residential real estate brokerage services to in-state and out-of-state clients seeking to buy or sell property in the Detroit Market.

97.  Realcomp's rules and practices have harmed competition in a very specific way.  As a result of Realcomp's rules and regulations regarding membership, Findling and those in the Exempt Roles and the estates which they represent have few other choices and must pay unnecessary fees for brokerage services to list and sell real estate.  Realcomp's rules and practices are not reasonably necessary to achieve the pro-competitive benefits of the MLS. Instead, the Realcomp Owners and Realcomp's rules unreasonably:

(1) raise entry barriers for Findling and those in the Exempt Roles by barring membership unless licensed as a broker, real estate agent or appraiser; and

(2) stabilize the price of, and reduce seller options for, brokerage services by dictating the unnecessary licensure that those in the Exempt Roles must maintain.

### COUNT I-FIRST CLAIM FOR RELIEF

### ILLEGAL MAINTENANCE OF
### MONOPOLY IN THE DETROIT MARKET
### FOR THE LISTING AND SALE OF REAL ESTATE

-19-

## (SECTION 2 OF THE SHERMAN ACT)

98.  Findling incorporates the allegations of all preceding paragraphs.

99.  As set forth above, Realcomp and the Realcomp Owners possess monopoly power in the Detroit Market.

100.  The Detroit Market is characterized by significant barriers to entry.

101.  Through the anticompetitive conduct described herein, Realcomp and the Realcomp Owners have willfully maintained that power by anticompetitive and unreasonably exclusionary conduct.

102.  Realcomp and the Realcomp Owners have acted with the intent to maintain their monopoly power in the Detroit Market for the listing and sale of real estate, and their illegal conduct has allowed them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

103.  Realcomp and the Realcomp Owners' conduct occurred in and affected interstate commerce.

104.  Realcomp and the Realcomp Owners' anticompetitive acts have harmed Findling and those in the Exempt Roles, consumers and competition.

105.  As a direct, foreseeable and proximate result of Realcomp and the Realcomp Owners' unlawful maintenance of its monopoly of the Detroit market, in violation of Section 2 of the Sherman Act, Findling and those in the Exempt Roles have been deprived of the benefits of free and fair competition on the merits. Findling and those in the Exempt Roles have been and will continue to be damaged, in amounts to be proven at trial.

106.  Findling and those in the Exempt Roles' injury is of the type the antitrust laws are intended to prevent and thus constitutes antitrust injury.

107.  Unless the activities complained of are enjoined, Findling and those in the Exempt Roles will suffer immediate and irreparable injury for which Findling and those in the Exempt Roles are without an adequate remedy at law.

## COUNT II-SECOND CLAIM FOR RELIEF

### UNLAWFUL TYING OF MEMBERSHIP IN THE REALCOMP OWNERS WITH MEMBERSHIP IN REALCOMP (SECTION 1 OF THE SHERMAN ACT)

108.  Findling incorporates the allegations of all preceding paragraphs.

109.  Membership in the Realcomp Owners' associations and membership in Realcomp offer separate and distinct services and are separate and distinct products.  Membership in the Realcomp Owners' associations is limited to licensed real estate agents, brokers and real estate appraisers.  The Realcomp Owners' associations are trade associations which provide principles, rules and regulations for their members.  Realcomp through its MLS provides a separate and distinct product.  As described in this Complaint, the Realcomp MLS is a means of listing and selling real estate in the Detroit Market.

110.  The Realcomp Owners and Realcomp have illegally tied there separate and distinct products.  To access the Realcomp MLS, the Realcomp Owners and Realcomp offer no choice to Findling and those in the Exempt Roles other than to employ a licensed real estate agent or broker who is one of their members.  Concommittantly, the Realcomp Owners exclude Findling and those in the Exempt Roles from membership because they are not licensed realtors, brokers or real estate appraisers.

111.  Findling and those in the Exempt Roles cannot obtain access to the Realcomp MLS without membership in a Realcomp Owner.  Through their bylaws, rules and regulations,

Realcomp and the Realcomp Owners insure that Findling and those in the Exempt Roles are unreasonable excluded from membership.

112.   Realcomp and the Realcomp Owners' rules and regulations achieve these adverse effects by requiring that members:

      a.   maintain a broker's license;
      b.   reside within the area served by Realcomp;
      c.   operate their offices during hours deemed reasonable by Realcomp;
      d.   agree to arbitration provisions counter to the jurisdiction of State, Federal and Bankruptcy Courts; and
      e.   hold a Michigan real estate license as their primary license.
         (Bylaw Article II, Section II; Bylaw Article VII; & Rule II)

113.   Realcomp and the Realcomp Owners' rules and regulations allow them to deny membership to Findling and those in the Exempt Roles which would increase competition.

114.   Applicants to a Realcomp Owner are required to disclose their business history and prior employment, undergo a credit check, and obtain letters of recommendation from three current broker-members, *i.e.*, those with whom the applicant would compete.  (Bylaw Article VII, Section IV; Bylaw Article VII, Section IV(a); Rule II.A.2.)

115.   Realcomp's rules have allowed unreasonable denials of membership and thus deprived Findling and those in the Exempt Roles from the benefits of competition.

116.   Realcomp and the Realcomp Owners' rules and regulations decrease competition and harms consumers because it insulates the members of the Realcomp Owners from the competitive pressures posed by Findling and those in the Exempt Roles.

117.   Taken together, Realcomp and the Realcomp Owners' rules and regulations discourage competition on price and service, and inhibit competitive actions that would alter the status quo.

-22-

118.  The Realcomp and the Realcomp Owners' use of their monopoly in trade or commerce in the Detroit Market was for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices for real estate services.

119.  The Realcomp and the Realcomp Owners' actions are unlawful pursuant to _____.

### COUNT III-THIRD CLAIM FOR RELIEF

### UNLAWFUL TYING OF MEMBERSHIP IN THE REALCOMP OWNERS WITH MEMBERSHIP IN REALCOMP (MCL 445.772)

120.  Findling incorporates the allegations of all preceding paragraphs.

121.  As set forth above, Realcomp and the Realcomp Owners possess monopoly power in the Detroit Market.

122.  The Detroit Market is characterized by significant barriers to entry.

123.  Through the anticompetitive conduct described herein, Realcomp and the Realcomp Owners have willfully maintained that power by anticompetitive and unreasonably exclusionary conduct.

124.  Realcomp and the Realcomp Owners have acted with the intent to maintain their monopoly power in the Detroit Market for the listing and sale of real estate, and their illegal conduct has allowed them to do so, in violation of MCL 445.772.

125.  Realcomp and the Realcomp Owners' conduct occurred in and affected trade or commerce in the Detroit Market.

126.  Realcomp and the Realcomp Owners' anticompetitive acts have harmed Findling and those in the Exempt Roles, consumers and competition.

127.  As a direct, foreseeable and proximate result of Realcomp and the Realcomp Owners' unlawful maintenance of its monopoly of the Detroit market, in violation of MCL 445.772, Findling and those in the Exempt Roles have been deprived of the benefits of free and fair competition on the merits. Findling and those in the Exempt Roles have been and will continue to be damaged, in amounts to be proven at trial.

128.  Findling and those in the Exempt Roles' injury is of the type the antitrust laws are intended to prevent and thus constitutes antitrust injury.

129.  Unless the activities complained of are enjoined, Findling and those in the Exempt Roles will suffer immediate and irreparable injury for which Findling and those in the Exempt Roles are without an adequate remedy at law.

### COUNT IV-FOURTH CLAIM FOR RELIEF

### ILLEGAL MAINTENANCE OF
### MONOPOLY IN THE DETROIT MARKET
### FOR THE LISTING AND SALE OF REAL ESTATE
### (MCL 445.773)

130.  Findling incorporates the allegations of all preceding paragraphs.

131.  Membership in the Realcomp Owners' associations and membership in Realcomp offer separate and distinct services and are separate and distinct products.  Membership in the Realcomp Owners' associations is limited to licensed real estate agents, brokers and real estate appraisers.  The Realcomp Owners' associations are trade associations which provide principles, rules and regulations for their members.  Realcomp through its MLS provides a separate and distinct product.  As described in this Complaint, the Realcomp MLS is a means of listing and selling real estate in the Detroit Market.

132.   The Realcomp Owners and Realcomp have illegally tied there separate and distinct products.   To access the Realcomp MLS, the Realcomp Owners and Realcomp offer no choice to Findling and those in the Exempt Roles other than to employ a licensed real estate agent or broker who is one of their members.   Concommittantly, the Realcomp Owners exclude Findling and those in the Exempt Roles from membership because they are not licensed realtors, brokers or real estate appraisers.

133.   Findling and those in the Exempt Roles cannot obtain access to the Realcomp MLS without membership in a Realcomp Owner.   Through their bylaws, rules and regulations, Realcomp and the Realcomp Owners insure that Findling and those in the Exempt Roles are unreasonable excluded from membership.

134.   Realcomp and the Realcomp Owners' rules and regulations achieve these adverse effects by requiring that members:

      a.   maintain a broker's license;
      b.   reside within the area served by Realcomp;
      c.   operate their offices during hours deemed reasonable by Realcomp;
      d.   agree to arbitration provisions counter to the jurisdiction of State, Federal and Bankruptcy Courts; and
      e.   hold a Michigan real estate license as their primary license. (Bylaw Article II, Section II; Bylaw Article VII; & Rule II)

135.   Realcomp and the Realcomp Owners' rules and regulations allow them to deny membership to Findling and those in the Exempt Roles which would increase competition.

136.   Applicants to a Realcomp Owner are required to disclose their business history and prior employment, undergo a credit check, and obtain letters of recommendation from three current broker-members, *i.e.*, those with whom the applicant would compete.   (Bylaw Article VII, Section IV; Bylaw Article VII, Section IV(a); Rule II.A.2.)

-25-

137.  Realcomp's rules have allowed unreasonable denials of membership and thus deprived Findling and those in the Exempt Roles from the benefits of competition.

138.  Realcomp and the Realcomp Owners' rules and regulations decrease competition and harms consumers because it insulates the members of the Realcomp Owners from the competitive pressures posed by Findling and those in the Exempt Roles.

139.  Taken together, Realcomp and the Realcomp Owners' rules and regulations discourage competition on price and service, and inhibit competitive actions that would alter the status quo.

140.  The Realcomp and the Realcomp Owners' use of their monopoly in trade or commerce in the Detroit Market was for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices for real estate services.

141.  The Realcomp and the Realcomp Owners' actions are unlawful pursuant to MCL 445.773.

**VIOLATIONS OF THE SHERMAN ACT AND THE MICHIGAN ANTITRUST ACT**

142.  Realcomp and the Realcomp Owners' rules, regulations and practices constitute a contract, combination, or conspiracy by competitors with market power that unreasonably restrains competition in the Detroit Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Realcomp and the Realcomp Owners' rules and regulations are not reasonably necessary to carry out the procompetitive purposes of the Realcomp MLS.

143.  Realcomp and the Realcomp Owners' rules, regulations and practices constitute a contract, combination, or conspiracy by competitors with market power that unreasonably restrains competition in the Detroit Market in violation of MCL 445.772 and 445.773.  Realcomp

-26-

and the Realcomp Owners' rules and regulations are not reasonably necessary to carry out the procompetitive purposes of the Realcomp MLS.

144. Realcomp and the Realcomp Owners' combination, and/or conspiracy has had and will continue to have unreasonable anticompetitive effects in the Detroit Market, including:

    a. stabilizing and raising sale costs for Findling and those in the Exempt Roles;

    b. reducing competition on price and quality for real estate brokerage services; and

    c. creating barriers to entry into the provision of real estate brokerage services by Findling and those in the Exempt Roles.

## REQUEST FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

145. Pursuant to 15 U.S.C. § 25, Findling and those in the Exempt Roles request that the Court prevent, restrain, prohibit and enjoin further antitrust violations by Realcomp and the Realcomp Owners.

146. Pursuant to MCL 445.778(2), Findling and those in the Exempt Roles request that the Court prevent, restrain, prohibit and enjoin further antitrust violations by Realcomp and the Realcomp Owners.

## REQUEST FOR SPECIFIC RELIEF

WHEREFORE, the Plaintiff, David Findling and those in the Exempt Roles pray that final judgment be entered against Defendants, Realcomp and the Realcomp Owners' declaring, ordering, and adjudging:

    a. Realcomp and the Realcomp Owners' rules and regulations constitute a contract, combination, or conspiracy which unreasonably restrains trade and is illegal under Section 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2 and MCL 445.772 and 445.773;

    b. The Realcomp and the Realcomp Owners', their officers, directors, agents,

employees, successors, and assigns and all other persons acting or claiming to act on their behalf, be permanently enjoined from engaging in, carrying out, renewing or attempting to engage in, carry out or renew the combination and conspiracy alleged herein, or any other combination or conspiracy having a similar purpose or effect in violation of Section 1 of the Sherman Act. 15 U.S.C. § 25 and MCL 445.778(2); and

c.  The Court grant such other relief as the Plaintiff, David Findling and those in the Exempt Roles may request and the Court deems just and proper.

"The foregoing is true to the best of my knowledge, information and belief."

Dated: April 17, 2017                    /s/ David Findling
                                         David Findling, P43256


                                         Respectfully submitted,


Dated: April 17, 2017                    /s/ David Findling
                                         David Findling, P43256
                                         Erica Ehrlichman, P64519
                                         The Findling Law Firm, PLC
                                         415 S. West St.
                                         Royal Oak, MI 48067
                                         (248) 399-9700
                                         e-mail: David@Findlinglaw.com